# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JOE PASSALAQUA,

     Plaintiff,

     v.

J.R. BELL, *Warden, FCI Cumberland,*
MOUBAREK, *Clinical Director,*
*FCI Cumberland,*
HAMILTON,
*HS ADMINISTRATOR, FCI Cumberland,*
FOOTE, AHSA, *FCI Cumberland,*
T. GERA, *LCDR-PA-C, FCI Cumberland* and
KRISTI CRITES, *CRNP, FCI Cumberland,*

     Defendants.

Civil Action No. TDC-19-2940

## MEMORANDUM OPINION

Plaintiff Joe Passalaqua,[1] a federal inmate housed at the Beaumont Federal Correctional Institution in Beaumont, Texas ("FCI-Beaumont"), has filed this civil rights action pursuant to 42 U.S.C. § 1983 asserting that he received inadequate medical care in violation of his rights under the Eighth Amendment of the United States Constitution while he was incarcerated at the Federal Correctional Institution in Cumberland, Maryland ("FCI-Cumberland"). Pending before the Court is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED.

---

[1] The Court uses the spelling of Plaintiff's name that Plaintiff provided in his most recent filing and that is reflected in his prison and medical records. The Clerk shall correct the docket to reflect this spelling as well as the full names of Defendants, as set forth below.

## BACKGROUND

In his verified Complaint, Passalaqua asserts that he suffered from back pain while incarcerated at FCI-Cumberland from April 3, 2019 to August 26, 2019 but received inadequate medical care from Defendants Dr. Mohamed Moubarek, the Clinical Director at FCI-Cumberland; Jamie Hamilton, the former Health Services Administrator at FCI-Cumberland; Alison Foote, the current Health Services Administrator at FCI-Cumberland; Thomas Gera, a physician's assistant; and Kristi Crites, a nurse practitioner. He also seeks to hold Defendant J.R. Bell, Warden of FCI-Cumberland, responsible for the allegedly inadequate medical care.

### I. Back Pain

Passalaqua states that on March 27, 2019, while he was at FCI-Cumberland, he awoke with severe pain in his lower back. Over the next six days, Passalaqua rested, but at the end of that period he still had difficulty standing up straight and had extreme pain in his lower back extending to his left hip and down to the front center of his left thigh.

On April 2, 2019, Passalaqua was examined by Gera for his back pain. Gera prescribed a steroid injection to relieve the back pain. Gera also submitted a medication order for Prednisone, an oral steroid pain reliever, for a five-day period, and he ordered a lumbar spine x-ray. According to Passalaqua, he asked Gera if these medications were appropriate for someone with a history of kidney disease, and Gera told him that they would "not be a problem." Compl. ¶ 6, ECF No. 1. The next day, Passalaqua received the x-ray, which revealed moderate to severe multilevel degenerative disc disease in the lumbar spine. Passalaqua was notified that the x-ray results were "abnormal" and that he would receive an appointment to discuss the results. Moubarek Decl. ¶ 5, Mot. Dismiss Ex. 2, ECF No. 10-3.

2

On April 12, 2019, Gera met with Passalaqua to discuss the x-ray results. Passalaqua continued to complain of back pain, and Gera conducted another examination, which revealed muscle spasms, tenderness, and decreased range of active motion. Gera issued another medication order for Prednisone and advised Passalaqua to engage in light stretching exercises. After taking Prednisone, Passalaqua experienced frequent urination and blood in his urine. When he reported these conditions to a nurse, she noted that bleeding is a common side effect for someone with kidney problems and stopped his use of Prednisone.

On May 3, 2019, during an examination by Crites, Passalaqua complained of lower back pain in the area of his sacrum, at the base of the lumbar vertebrae, and pain shooting down his left leg to his toes. Crites determined that Passalaqua had tenderness in his left lower back but that his left lower leg had full range of motion and strength. Passalaqua reported that when he took Prednisone, it caused him to have blood in his urine. Passalaqua also reported that he had taken Naprosyn, an over-the-counter, non-steroidal anti-inflammatory drug ("NSAID"). Crites prescribed Mobic (Meloxicam), a different NSAID, and advised Passalaqua to take either Naprosyn or Mobic, but not both. Passalaqua requested magnetic resonance imaging ("MRI") of his back, soft shoes, and a bottom bunk pass, consisting of a medical order requiring him to receive a bottom bunk. Crites ordered an x-ray of Passalaqua's sacrum area and referred Passalaqua's requests to Dr. Moubarek, the Clinical Director.

On May 10, 2019, Passalaqua submitted an informal administrative request seeking the MRI, soft shoes, and bottom bunk pass. On May 15, 2019, Hamilton responded to the request by stating that Passalaqua would receive an appointment with the Clinical Director, Dr. Moubarek. On May 20, 2019, Passalaqua filed a formal Administrative Remedy Request ("ARR") with Warden Bell. On May 24, 2019, Passalaqua spoke to Warden Bell and asked for assistance in

obtaining medical care.  According to Passalaqua, Warden Bell told him," "I do not care about medical, deal with the doctor."  Compl. ¶ 23.  On June 12, 2019, Warden Bell denied the ARR.

The x-ray ordered by Crites, taken on June 12, 2019, revealed severe degenerative disc disease, a form of arthritis.  On June 14, 2019, Crites advised Passalaqua of the results and instructed him to continue to take pain relievers.  On June 19, 2019, Passalaqua was seen by a registered nurse for complaints of lower back pain and painful bone spurs on his toes.  The nurse observed that he was walking without difficulty and did not appear to be in acute distress.  He was given a three-day supply of Ibuprofen, a pain reliever.  He declined to receive a medical order excusing him from work.

On June 28, 2019, during a follow-up appointment to the June 19 visit, Crites observed that Passalaqua was walking with a slightly altered gait due to the pain he was experiencing.  She provided him with a seven-day supply of Ibuprofen and ordered an x-ray of his left hip.  The x-ray, taken on July 8, 2019, showed no concerning results.  Passalaqua was notified of the results on July 10, 2019.

On July 16, 2019, Passalaqua was examined by Dr. Moubarek and Crites.  The examination revealed a lack of muscle weakness, no loss of bowel or bladder function, mild pain, and no muscle atrophy of lower extremities.  Passalaqua was prescribed Acetaminophen (Tylenol) and was told to use NSAIDs only for extreme pain.  Although Dr. Moubarek concluded that Passalaqua did not meet the requirements for a bottom bunk or for soft shoes at that time, Passalaqua stated that he was presently in a bottom bunk anyway.  Crites ordered an x-ray of Passalaqua's feet to determine if he had bone spurs, which if found, would result in a request for a referral to a podiatrist.  According to Passalaqua, Dr. Moubarek told him during that examination that he would not approve Passalaqua receiving a referral to a podiatrist or receiving back surgery, and that inmates

4

are not sent for outside consultations with orthopedists or podiatrists. Dr. Moubarek denies making these statements.

The x-ray of Passalaqua's feet, taken on July 19, 2019, showed severe osteoarthritis of the right great toe, minimal osteoarthritis of the left great toe, a bone spur on the right foot, and a "tiny" bone spur on the left foot. Med. Records at 53, Mot. Dismiss Ex. 2, ECF No. 10-3. Passalaqua was advised of the x-ray results on July 29, 2019. Passalaqua has submitted affidavits from four inmates attesting to having witnessed his mobility problems at FCI-Cumberland.

**II.    Kidney Disease**

According to Passalaqua, he has had an ongoing history of kidney disease, and that in early 2014, he was transferred to the Federal Correctional Institution Hazelton in West Virginia, a level two medical care facility, because of his kidney disease. Passalaqua's medical records reflect that he received a diagnosis of Stage 3 (moderate) chronic kidney disease on November 20, 2014, and that it was resolved as of May 26, 2015. According to Passalaqua, however, tests in 2017, 2018, and February 2019 showed that he still had chronic kidney disease at those times.

During his July 16, 2019 examination, Dr. Moubarek and Crites assessed Passalaqua as having Stage 3 kidney disease based on "slightly elevated creatinine levels" but ordered a Cystatin C lab test to confirm this diagnosis. Moubarek Decl. ¶ 11. On July 24, 2019, the Cystatin C lab test was completed with normal results, reflecting that Passalaqua did not in fact have kidney disease. Passalaqua's medical records now show that the Stage 3 kidney disease was in "remission" as of September 27, 2019, and that as of that date he is deemed to have Stage 2 (mild) chronic kidney disease. Med. Records at 84-85.

### III.    Transfer

On August 22, 2019, Crites performed Passalaqua's last medical examination at FCI-Cumberland prior to his transfer to FCI-Beaumont.  Crites noted that Passalaqua had tenderness in his back but moved without difficulty.  Although Passalaqua reported that Acetaminophen was not working very well for him, Crites told him that she would not prescribe NSAIDs due to his history of slightly elevated creatinine levels and the risk for kidney damage.  Passalaqua then agreed to accept additional doses of Acetaminophen.  He was transferred on August 26, 2019.

According to Passalaqua, at FCI-Beaumont, he received a bottom bunk pass, a soft shoe insert pass, and a cane.  He also reports that his kidney function was discussed, and that tests taken in March 2020 have shown that he still has Stage 2 chronic kidney disease.

### IV.    The Complaint

In his Complaint, Passalaqua alleges that he received inadequate medical care in violation of the Eighth Amendment.  He asserts that the failure to treat his back condition caused him to walk with a severe limp, resulting in painful bone spurs on his toes, and that the failure to provide him with an MRI, soft shoes, and a bottom bunk pass constituted deliberate indifference to his medical needs.  He also alleges that the medical providers' decisions to prescribe him Prednisone, which apparently caused him to have bleeding, Mobic, and Ibuprofen were improper, as those medications carry warnings for individuals with kidney disease.  Passalaqua requests declaratory relief, injunctive relief, and damages.

### DISCUSSION

### I.    Motion for Appointment of Counsel

As a preliminary matter, Passalaqua has filed a Motion for Appointment Counsel.  "The court may request an attorney to represent any person" proceeding *in forma pauperis* who is "unable to afford counsel."  28 U.S.C. § 1915(e)(1) (2018).  In civil actions, the Court appoints

counsel only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989). Exceptional circumstances include a litigant who "is barely able to read or write," *id.* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008); *see also Altevogt v. Kirwan*, No. WDQ-11-1061, 2012 WL 135283, at *2 (D. Md. Jan. 13, 2012). Inherent in this analysis is that one's indigence is insufficient to establish exceptional circumstances. Here, Passalaqua's proffered reasons do not show exceptional circumstances or a particular need that would require the immediate assistance of an attorney. Passalaqua's claim is not unduly complicated, and he has been able to articulate his claims without difficulty. Because there are no exceptional circumstances warranting the appointment of counsel, the Motion will be denied.

## II.     Motion to Dismiss or, in the Alternative, for Summary Judgment

Defendants seek dismissal of all claims under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. Specifically, they argue that: (1) certain Defendants who are commissioned personnel of the United States Public Health Service are immune from suit; (2) Passalaqua has failed to allege sufficient facts to support a claim of personal or supervisory liability against Warden Bell; (3) the allegations and record evidence do not support plausible claims for violations of the Eighth Amendment against all Defendants; (4) equitable relief is not available in an action filed under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); (5) requests for unspecified money damages may not stand; and (6) Defendants are entitled to qualified immunity.

### A.    Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678.  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff.  *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Defendants filed their Motion as a Motion to Dismiss or, in the Alternative, for Summary Judgment and submitted numerous exhibits in support of their Motion.  Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint."  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded.  Fed. R. Civ. P. 12(d).  Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements:  (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

8

Here, the notice requirement has been satisfied by the title of Defendants' Motion.  To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002).  In this instance, Passalaqua has not requested discovery prior to the resolution of the Motion, and he has submitted a verified Complaint and exhibits of his own.  The Court therefore will treat the Motion as one seeking summary judgment for those claims requiring consideration of the exhibits.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B.    Public Health Service Officers

Defendants first assert that at the time of the relevant events, Foote, Hamilton, Gera, and Crites were commissioned personnel of the United States Public Health Service ("PHS") and are thus immune from suit.  Each of these Defendants have provided a declaration attesting to this

status. By statute, commissioned officers and employees of PHS are immune from liability for damages "resulting from the performance of medical . . . functions." 42 U.S.C. § 233(a) (2018). This provision "precludes *Bivens* actions against individual PHS officers or employees" for harm arising from the performance of their duties. *Hui v. Castaneda,* 559 U.S. 799, 812 (2010). Therefore, Passalaqua's claims against Foote, Hamilton, Gera and Crites are barred by this statutory immunity. The claims against these Defendants will be dismissed.

### C.  Eighth Amendment

Passalaqua's claim against the remaining Defendants is that he was denied constitutionally adequate medical care in violation of the Eighth Amendment. As Passalaqua is a federal prisoner, he asserts these claims pursuant to *Bivens. See Carlson v. Green,* 446 U.S. 14, 16 n.1, 23 (1980) (applying *Bivens* to an Eighth Amendment claim for failure to provide adequate treatment for a prisoner's medical condition).

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. An inmate's Eighth Amendment rights are violated when there is "deliberate indifference" to "serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Jackson v. Lightsey,* 775 F.3d 170, 178 (4th Cir. 2014). A deliberate indifference claim has both objective and subjective component. The plaintiff must have an objectively serious medical condition, consisting of "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson,* 775 F.3d at 178 (quoting *Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir. 2008)).

As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). "[I]t is

10

not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 835). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.*

Passalaqua alleges deliberate indifference based on the treatment of his back pain that led him to develop bone spurs and a limp; the denial of an MRI, a consultation with a specialist, a bottom bunk pass, and soft shoes; and the prescribing of medications that caused bleeding as a result of his chronic kidney disease. Although there is no dispute that Passalaqua's back condition was an objectively serious medical condition, the record evidence, including Passalaqua's medical records, does not support a finding of deliberate indifference. The medical records reflect that from Passalaqua's first complaint of pain to medical staff on April 2, 2019, to his transfer out of FCI-Cumberland less than five months later on August 26, 2019, Passalaqua received regular medical examinations to address his back pain, was prescribed multiple different medications to address his pain, and received x-rays on four different occasions to assist in the diagnosis of the cause of pain in his back and feet. Even if Passalaqua's course of treatment failed to prevent the development of bone spurs that caused Passalaqua to limp, the amount and type of care provided by Defendants does not support a finding of subjective, reckless disregard for Passalaqua's medical needs.

11

The denial of Passalaqua's specific requests for certain consultations, tests, and accommodations also do not constitute deliberate indifference. Particularly where Defendants provided numerous diagnostic tests in the form of x-rays, the evidence does not show that the decision not to provide an MRI constituted deliberate indifference. Notably, the medical records reflect that Passalaqua's foot pain was reported to medical staff in June 2019, and that Crites then ordered an x-ray of Passalaqua's feet in July 2019, with the expectation that Passalaqua would be referred to a specialist if bone spurs were found. Where the results showing bone spurs were received in late July 2019, and Passalaqua was transferred out of FCI-Cumberland in August 2019, the failure to send Passalaqua to a specialist before his departure did not constitute deliberate indifference. Significantly, the evidence does not show how an MRI or a referral to a specialist would have led to a different diagnosis or a more effective treatment.

As for the bottom bunk pass and soft shoes, the record reflects that Passalaqua already had the use of a lower bunk. When Dr. Moubarek examined Passalaqua on July 16, 2019 and found a lack of muscle weakness, mild pain, and no muscle atrophy of the lower extremities, he determined that Passalaqua did not meet the requirements for a bottom bunk pass or soft shoes at that time. At most, these determinations reflect a disagreement between Passalaqua and his medical provider which would not support a finding of deliberate indifference. *Scinto*, 841 F.3d at 225.

Finally, Passalaqua claims that the prescribing of Prednisone, Mobic, and Ibuprofen was improper because of his chronic kidney disease, and that the Prednisone caused him to develop blood in his urine. The medical records, however, are unclear on whether Passalaqua had chronic kidney disease when he was prescribed Prednisone in April 2019, and Passalaqua has acknowledged that once he reported bleeding, a nurse directed him to stop taking the drug. Under these circumstances, even if it was improper to prescribe Prednisone to Passalaqua, where that

12

decision was reversed promptly, and the other pain relievers did not result in a similar reaction, the Court does not find deliberate indifference arising from the prescribing of pain relievers. *See Jackson*, 775 F.3d at 178 (stating that "deliberate indifference is more than mere negligence"). Notably, Dr. Moubarek, the only remaining Defendant who provided medical care, was not involved in the initial decision to prescribe Prednisone, and once he examined Passalaqua, he ordered a test which showed that as of July 2019, Passalaqua did not have chronic kidney disease. Even then, as a precaution, Passalaqua was not prescribed any NSAIDs going forward.

On this record, the Court finds that Passalaqua received regular and consistent medical attention for his conditions and that FCI-Cumberland medical staff did not deliberately fail to provide treatment or act with reckless disregard to his serious medical needs. Although Passalaqua may disagree with decisions about the medications prescribed to treat him and the denial of assistive devices, disagreements between an inmate and a medical provider are insufficient to demonstrate deliberate indifference. *See Jackson*, 775 F.3d at 178; *Russell v Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review."). Accordingly, the Court will grant the Motion on the Eighth Amendment claims. It therefore need not and does not address Defendants' remaining arguments.

## CONCLUSION

For the foregoing reasons, Passalaqua's Motion for Appointment of Counsel will be DENIED. Defendants' Motion to Dismiss the Complaint, or in the Alternative, for Summary Judgment will be GRANTED. A separate Order shall issue.


Date: February 19, 2021

THEODORE D. CHUANG
United States District Judge

13